Filed 5/23/22  P. v. Campos CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ESTEBAN ANTHONY CAMPOS,<br><br>    Defendant and Appellant. | C091923<br><br>(Super. Ct. No. P19CRF0526) |

On Christmas Day, defendant Esteban Anthony Campos beat his girlfriend.  The next day defendant beat his girlfriend again, trapped her in the garage of their home, and threatened her life.  On the first offense, a jury found defendant guilty of false imprisonment by violence (Pen. Code, § 236 – count 2)[1] and misdemeanor simple assault (§ 240), as a lesser included offense of corporal injury to a dating partner (§ 273.5 –

---

[1]  Undesignated statutory references are to the Penal Code.

1

count 1).  On the second offense, a jury found defendant guilty of one count of corporal injury to a dating partner (§ 273.5 – count 3), making criminal threats (§ 422 – count 5), and false imprisonment by violence (§ 236 – count 6).  On count 1, the jury found defendant guilty of several lesser offenses, which we will discuss further below.  The trial court entered a verdict and subsequently imposed a sentence only on the simple assault conviction for count 1.  The trial court sentenced defendant on the corporal injury conviction of count 3 as the principal term, found section 654 not applicable on any of the counts, and imposed consecutive sentences on the remaining counts.

On appeal, defendant challenges the imposition of consecutive sentences for the offenses on counts 1 and 2, counts 3 and 5, and counts 3 and 6 as violating section 654.[2] He also contends there is an error in the abstract of judgment that requires correction. We conclude section 654 applies to counts 1 and 2 and the abstract of judgment needs correction.  We affirm the convictions, vacate the sentence, and remand for resentencing. We order the trial court to ensure the abstract of judgment correctly reflects the conviction in count 6.

FACTUAL BACKGROUND

Defendant and Mary B. had a friendship for years that developed into an on-and-off intimate relationship.  In December of 2019, their intimate relationship was on.  In late December, Mary was housesitting for a friend along with defendant and her three children, ages nine, six, and four.  On Christmas morning, while her children were at their grandmother's house, defendant and Mary shared "an intimate moment."  Defendant then

---

[2] In their brief, the People contended the trial court violated section 654 by failing to impose sentence on count 1 under the provision that provided for the longest potential sentence.  They claimed, under section 654, the trial court improperly chose to impose punishment on the simple assault conviction, rather than the battery on a dating partner conviction.  Based on the statutory changes made to section 654 by Assembly Bill No. 518 (2021-2022 Reg. Sess.) the People have withdrawn this argument.

told her he had been looking through her phone, told her to tell him the truth, and implicitly threatened her. She went to get dressed and was concerned because his body language and attitude seemed aggressive. While getting dressed she could not find her phone or car keys. Defendant's attitude and her inability to find her phone or keys made her concerned for her safety, so she took two pocketknives out of her suitcase and put them in her pockets. Defendant apparently heard the knives clink together and immediately started arguing with her. She started to walk away from him, and he slammed her to the floor. She fought back and as the fighting continued, he grabbed her arm and wrapped it around her neck, choking her. He held her like that for about 5 to 10 minutes. Her head started to get tingly, one of the knives dropped out of her pocket, and defendant picked it up. He held the unopened knife in his closed fist, while Mary held the other closed knife in her hand. He kept her pinned down while choking her, easing the pressure to ask her questions. If she answered the questions incorrectly, he increased the pressure and punched her in the face. He continued to question her and demand she tell him the truth. Ultimately, Mary was able to get free from defendant. As she was standing in front of a second story window, he said he could push her out. He then told her he had seen recent conversations on her phone between her and another man. He did not return her phone until later that afternoon and told her he had put a tracking device on her phone. She did not call the police because she was worried the tracker would alert him. She was still afraid of defendant when she went to pick up her children later that afternoon. That evening, with the children at home, Mary and the children opened presents and had their Christmas night.

The next day, Mary slept in. In the early afternoon, defendant said he wanted to surprise her with something "really nice." Wary because of his assault the day before, she declined. Around 7:30 p.m., Mary went to put her children to bed and realized defendant had disappeared and again taken her phone. After the two younger children fell asleep, she told her nine-year-old son that as soon as she got defendant to fall asleep,

3

she needed his help getting the other children out of the home because defendant was "not being safe right now" and they "need[ed] to leave."

Defendant came into the room with no shirt on, crying, babbling, and apologizing. Her phone slipped out of his pocket, she slid it over to her son, and he covered it with a pillow. Mary was trying to understand what was wrong with defendant and what he was saying when he sat up, handed her back a promise ring she had given him, and walked outside. She crawled over to her son and told him she was going to check on defendant and if he heard anything he was to call 911.

Mary went to the garage and defendant was there, screaming, growling, and destroying her friend's property. She asked what he was doing, and he "yelled-growled" and ran outside. She stayed in the doorway of the garage yelling for him and asking if he was okay. He came out from behind a storage container with his fists clenched and a "pure look of death on his face." She ran back toward the house to try to lock him out. He grabbed her from behind and slammed her against the wall. She was fighting to get away from him, but he had his arms around her arms and shoulders and repeatedly hit her against the wall. They were hitting and punching each other. She was able to push him back enough that she could run out of the garage to her van, about 15 feet away. She tried to open the van, but it was locked. He came up behind her and smashed her against the window. She tried to fight back again and ran around the van, but the other doors were also locked. This part of the fight lasted about 10 minutes.

Mary then heard defendant yelling at her son inside the house, so she ran to the front door. The front door was locked, and she could not get back in, so she ran to the back of the house and broke the door down. She started to run into the house and defendant "cold-cocked [her] throat with his arm," grabbed her by the throat, and dragged her into the garage. He threw her on the concrete ground and strangled her. One leg was over her stomach and his torso was over her as he continued to choke her. She could not move and she could not breathe. She lost consciousness. The distance from where he

4

"cold-cocked" her with his arm to her throat was approximately 7 to 10 feet away from where he threw her on the ground and strangled her in the garage. She regained consciousness when he picked her up and shook her by the shoulders. He told her he was not done with her. She kicked him and tried to run out the door. He picked her up by her shirt and pants and threw her further into the garage. He started punching her in her face and the back of her head. She tried to fight back. He held onto the back of her hair and used it to smash her head back into the concrete five to seven times. Defendant was on top of her with his legs wrapped around her legs so she could not move them. This fight in the garage lasted about 27 minutes.

During this time, defendant threatened to kill Mary over 20 times. He called her scum and told her it was his job to rid the world of scum. He said he might not be able to overcome her in a fair fight, but he would get her in a surprise attack. He asked if she had any last requests and she asked to see her children. He said he was doing her children, ex-husband, grandmother, and the world a favor by killing her. As he made these threats, defendant repeatedly punched her, used her arm to choke her, and kneed her in the ribs. She believed he was going to kill her and was also afraid of what he would do to her children after he killed her. Defendant was on top of her with his legs wrapped around her legs so she could not move them. She was staring at the ceiling while he punched her and screamed in her ear, and then bit her in her ear and growled. Then she saw the flashing red and blue lights of law enforcement arriving. Defendant got up and with both arms smashed her head into the concrete, stood over her, and said this is not done, "You are never safe." Then he ran out a back door.

Mary ran into the house to her children. A deputy sheriff knocked on the door and Mary's son let them in. Mary identified herself, told them she was the victim and that defendant had fled. The deputy told her to take the children to his patrol car.

One of the deputies put Mary and the children in his patrol car and took them to a safe location to receive medical treatment. The medics transported Mary and her children

5

to the hospital. She continued to have trouble breathing most of the night and even after the incident, and still had an altered voice at the time of trial because of the damage to her throat. She had bruises on her face, throat, chest, neck, legs, arms, and hips. She also had scratches on her back. She sustained a concussion "in three different spots."

Defendant was apprehended the next day.

PROCEDURAL HISTORY

The district attorney charged defendant with two counts of corporal injury to a dating partner (§ 273.5, subd. (a) – counts 1 & 3), two counts of false imprisonment (§ 236 – counts 2 & 6), kidnapping (§ 207, subd. (a) – count 4), making criminal threats (§ 422 – count 5), and misdemeanor child endangerment (§ 273a, subd. (b) – count 7). As to count 3, the information also alleged defendant had inflicted great bodily injury (§ 12022.7, subd. (e)).

The jury found defendant not guilty of corporal injury to a dating partner as charged in count 1 but found him guilty of all three lesser included offenses of battery to a dating partner, simple battery, and simple assault. After discussing what it described as the "inconsistent" verdicts on count 1 with the parties, the court entered a guilty verdict on that count only as to the simple assault. The jury found defendant guilty of corporal injury to a dating partner as charged in count 3 and found true the great bodily injury enhancement. The jury also found defendant guilty of making criminal threats and two counts of false imprisonment. The jury acquitted defendant on kidnapping and misdemeanor child endangerment.

At sentencing, the trial court considered the probation report, the victim impact statement, defendant's statement, and the arguments of the prosecutor. The court also stated it had heard the testimony at trial. The court again noted the verdict entered on count 1 was the lesser included misdemeanor simple assault. The court found counts 1 and 2 were separate and distinct from each other, as were counts 3, 5, and 6. The court indicated count 3 was an offense that occurred in the garage, count 5 occurred when

6

Mary awoke after losing consciousness, and count 6 was separate and distinct as it occurred in a different area of the home. The court also found the offenses committed on Christmas were separate and distinct from the offenses committed the following day. Accordingly, the court concluded there were no section 654 issues as to any of the counts.

The court sentenced defendant on inflicting corporal injury on a dating partner (count 3) as the principal term, to the midterm of three years, plus a consecutive term of four years for the great bodily injury enhancement. The court imposed consecutive eight-month terms (one-third the midterm) on each of the felony false imprisonment convictions (counts 2 & 6) and the criminal threats conviction (count 5). As to the lesser included conviction of simple assault in count 1, the court imposed a consecutive 180-day term.

DISCUSSION

I

*Section 654*

*General Legal Background*

At the time of sentencing, section 654,[3] subdivision (a) provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." Thus, section 654 precludes multiple punishment for separate offenses

---

[3] Since sentencing occurred in this case, Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1, eff. Jan. 1, 2022) amended section 654. It now provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).)

7

arising out of a single occurrence or course of conduct when all of the offenses were incident to a single intent and objective. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331.) "However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) Similarly, "if a series of acts are committed within a period of time during which reflection was possible [citation], section 654 does not apply." (*People v. Kelly* (2016) 245 Cal.App.4th 1119, 1136.) " '[A] course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' [Citations.] This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) We review the trial court's finding whether section 654 applies for substantial evidence. (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1289; *People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

*Counts 1 and 2—Simple Assault and False Imprisonment*

Defendant contends the trial court violated section 654 by imposing consecutive sentences on counts 1 and 2, the simple assault and false imprisonment that occurred on Christmas Day. He contends the assault was part of the false imprisonment by violence

and necessary to its execution. The People claim the assault was complete after defendant slammed Mary to the ground; that is, he threw her to the ground out of anger and then imprisoned her to interrogate her. We conclude section 654 applies to counts 1 and 2.

Here, the acts that constituted the assault cannot be separated from the false imprisonment by violence. Defendant started an argument with Mary after he found information on her phone regarding another man. He told her to tell him the truth about the information and threatened her with violence to get the information from her. When she did not give him satisfactory answers, he slammed her to ground, wrapped her arm around her neck, strangled her for 5 to 10 minutes, and repeatedly punched her in the face. He had his legs wrapped around her and control of her arm, she could not move. During this time, he was also questioning her and when she gave "incorrect" answers, he increased the force of his restraint and his violence. The prosecution argued those facts supported the offense of inflicting a traumatic injury on Mary. The prosecution also argued those same facts supported the offense of false imprisonment by violence. That the defendant was convicted of simple assault as a lesser included offense rather than inflicting corporal injury does not change the analysis of the intent and objective of his action. Even accepting the People's argument that the assault was complete before the false imprisonment began, there is no evidence that this course of conduct was divisible in time in such a way as to afford defendant time to reflect and renew his intent. Our review of the record reveals the assault and false imprisonment were incident to the sole objective of interrogating Mary about the information he found on her phone. We conclude section 654 applies to prohibit separate punishments for the simple assault in count 1 and the false imprisonment by violence in count 2.

Effective January 1, 2022, section 654 was amended to provide the trial court with discretion to impose a sentence on any one of the crimes subject to section 654. There is

9

no longer a requirement to impose the longest possible sentence. Accordingly, we will remand to the trial court for resentencing.

*Counts 3 and 5—Corporal Injury on a Dating Partner and Criminal Threats*

Defendant contends the trial court violated section 654 by imposing consecutive sentences on counts 3 and 5, the corporal injury on a dating partner and criminal threats offenses that occurred the day after Christmas. He contends the threats were made in the course of inflicting bodily injury on her and "intended to explain his actions."

Here, the record supports the trial court's finding that these offenses involved multiple objectives. In beating Mary and choking her into unconsciousness, defendant intended to inflict physical pain and injury on Mary. In threatening to kill her over 20 times, calling her scum and asserting it was his job to rid the world of scum, asking if she had any last requests, and claiming he was doing her loved ones and the world a favor by killing her, defendant intended to terrorize her and inflict psychological injury. Because defendant committed multiple and divisible acts with distinct objectives, section 654 was not violated by sentencing him on both the corporal injury and criminal threats charges. (See, e.g., *People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047 [the defendant was properly sentenced for both torture and criminal threats because a reasonable trier of fact could conclude that the criminal threats were in furtherance of a separate criminal objective, even if, in part, the threats were intended to break or beat the victim down emotionally and to discourage her from attempting to flee].) We conclude there is substantial evidence supporting the trial court's conclusion that these were separate offenses.

*Counts 3 and 6—Corporal Injury on a Dating Partner and False Imprisonment*

Defendant contends the corporal injury conviction was based on a single continuous course of conduct, beating Mary during which she repeatedly tried to escape. Thus, the false imprisonment by violence facilitated the infliction of corporal injury. He claims his single intent was to "administer a chastisement" to Mary, which "necessitated restraining her."

10

Initially, we disagree with defendant's characterization of his conduct and intent as a chastisement. This minimizes the violence of his conduct to an extent that is unsupported by the evidence. Defendant's intent in beating and threatening Mary was to inflict physical and psychological injury upon her and to prevent her from escaping his abuse. He beat her into unconsciousness, woke her up, then beat her more while restraining her from leaving.

At first glance the analysis of the section 654 claim as to counts 3 and 6 seems similar to that in counts 1 and 2, *ante*. However, as to counts 3 and 6, the record supports the inference defendant had time to reflect and renew his intent. After Mary ran to the van and found it locked, defendant assaulted her as he slammed her into the van window. He went into the house and when she tried to follow him into the house, he hit her in the throat, dragged her by her throat into the garage, threw her on the ground, and strangled her into unconsciousness. He shook her back to consciousness, yelling at her to wake up as he was not done with her. She then tried to escape him, and he threw her back onto the ground and started beating her again, slamming her head into the ground and choking her. He was on top of her and had his legs wrapped around her. She could not free herself from him. The false imprisonment by violence conviction was based on defendant's conduct after Mary lost consciousness, when defendant was on top of her with his legs wrapped around her, restraining her on the garage floor. That is, the period of time during which Mary was unconscious and defendant was trying to wake her afforded defendant the opportunity to reflect and renew his intent before committing the false imprisonment and continuing to assault Mary. We conclude there is substantial evidence supporting the imposition of separate sentences for counts 3 and 6.

11

## II

### *Abstract of Judgment*

The parties agree the abstract of judgment correctly indicates defendant was convicted in count 6 of a violation of section 236, but incorrectly describes that offense as cruelty to a child. Defendant's conviction in count 6 for violating section 236 is for false imprisonment by violence. As the parties agree, the abstract must be corrected to reflect the correct description of the conviction.

### DISPOSITION

The convictions are affirmed. The matter is remanded to the trial court for resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.) The trial court is directed to ensure the abstract of judgment reflects that the conviction in count 6 is for false imprisonment under section 236. The clerk of the trial court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.


  /s/
HOCH, J.


We concur:


  /s/
MAURO, Acting P. J.


  /s/
DUARTE, J.

12